## Case No. 17,653.

WILDES et al. v. SAVAGE.

[1 Story, 22;[1] 3 Law Rep. 1.]

Circuit Court, D. Massachusetts. Oct. Term, 1839.

BILLS OF EXCHANGE—PROMISE TO ACCEPT—GUARANTY OF FUTURE ADVANCES—NOTICE OF ACCEPTANCE—DISCHARGE OF GUARANTOR.

1. By the English law a promise to accept a non-existing bill of exchange, even though it be taken by the holder upon the faith of that promise, does not amount to an acceptance of the bill, when drawn in favor of the holder.

[Cited in Russell v. Wiggin, Case No. 12,-165.]

2. But it has been otherwise held by the supreme court of the United States. Yet if the bill be payable after sight, and not after date, such a promise has never been held in either country to be an acceptance of a non-existing bill.

[Cited in Payson v. Coolidge, Case No. 10,860; Russell v. Wiggin. Id. 12,165.]

[Cited in Brown v. Ambler, 66 Md. 397, 7 Atl. 904; Exchange Bank v. Rice, 98 Mass. 292; Franklin Bank v. Lynch. 52 Md. 276; Savannah Nat. Bank v. Haskins, 101 Mass. 372.]

3. It is not necessary, that the various parties to a negotiable instrument should be different persons in order to render it a bill of exchange.

[Cited in Brown v. Noyes. Case No. 2,023; Towne v. Smith, Id. 14,115.]

4. Upon a guaranty for future advances it is the duty of the parties making the advances to give notice to the guarantor of his acceptance thereof, and his consent to act under the guaranty. and to make the advances. But this doctrine does not apply, where the agreement to accept is cotemporaneous with the guaranty.

[Cited in Davis v. Wells, 104 U. S. 165.]

[Cited in Menard v. Scudder, 7 La. Ann. 385; Milroy v. Quinn, 69 Ind. 412; Thompson v. Glover, 78 Ky. 195; Walker v. Forbes, 25 Ala. 139.]

5. It is not necessary, that a further distinct notice should be given to the guarantor. of the amount of the advances actually made. or the terms upon which they were made. after the transactions are complete. There are, however, certain exceptions as when the advances are contingent, or there is a continuing guaranty.

[Cited in Bank of Newbury v. Sinclair, 60 N. H. 106. Distinguished in Kellogg v. Stockton, 29 Pa. St. 464. Cited in Lehigh Coal & Iron Co. v. Scallen (Minn.) 63 N. W. 246; Lowe v. Beckwith. 14 B. Mon. 184; Menard v. Scudder. 7 La. Ann. 385; Milroy v. Quinn. 69 Ind. 412; Paige v. Parker, 8 Gray. 214; Powers v. Bumcrotz, 12 Ohio St. 280.]

6. If after the credit has expired and the amount become due under a guaranty. a demand be made upon the debtor. and there be a default of payment, notice thereof must be given to the guarantor within reasonable time. But a demand is not necessary, if the debtor be insolvent at the time when the debt becomes due, and the credit has expired.

[Cited in Louisville Manuf'g Co. v. Welch, 10 How. (51 U. S.) 475.]

[Cited in Bray v. Marsh, 75 Me. 455; McKecknie v. Ward, 58 N. Y. 553; Vinal v. Richardson, 13 Allen, 533.]

7. In order to discharge the guarantor there must not only be a want of such notice, but

---

[1] [Reported by William W. Story, Esq.]

there must also be some loss or damage sustained by him in consequence, and then ·there will be a pro tanto allowance.

[Cited in Louisville Manuf'g Co. v. Welch, 10 How. (51 U. S.) 474.]

[Cited in Barhydt v. Ellis, 45 N. Y. 110; Bashford v. Shaw, 4 Ohio St. 268; Farmers' & Merchants' Bank v. Kercheval, 2 Mich. 513.]

8. Under the circumstances of this case, it was *held*, that due and sufficient notice was given, and that the guarantor was liable on his guaranty.

[9. Cited in Montgomery v. Kellogg, 43 Miss. 490, to the point that it is difficult to attempt to lay down any general rule as to what is reasonable notice, leaving each case to stand on its own distinguishing and special features.]

Assumpsit on a guaranty. The case came on to be heard upon a statement of facts, agreed by the parties, in substance as follows: The plaintiffs are bankers, doing business in London and in Boston. Samuel Austin, Jr. is their agent and attorney. In June, 1836, James S. Bruce, a merchant of Boston, applied to Mr. Austin for a credit upon the plaintiffs for two thousand pounds sterling, which said Austin agreed to issue, in behalf of the plaintiffs, upon condition, that the goods, purchased with the proceeds, should be consigned to the plaintiffs, and that, in addition thereto, as a further security, said Bruce should furnish a personal guaranty to the amount of five hundred pounds sterling. The defendant agreed to become such guarantor, and thereupon said Austin gave to said Bruce a letter of credit for the sum aforesaid, on behalf of the plaintiffs, dated June 7th, 1836, to be drawn for on account of said Bruce by Joseph Tuckerman, Jr., then about to proceed to the East Indies, or in his absence by the house of Russell & Co. of Canton. Upon the letter of credit, Bruce, by an indorsement in writing, promised to place the plaintiffs in funds to cover the drafts with a banker's commission, interest, charges, &c. or settle the same in Boston. And the defendant, by another indorsement in writing, guarantied to the plaintiffs a punctual fulfilment of Bruce's agreement, to the extent of five hundred pounds sterling, promising, in case of his default, to pay that amount on demand to the order of the plaintiffs. Joseph Tuckerman proceeded to the East Indies soon after the date of the letter of credit. On the 28th of November, 1836, Bruce became insolvent and executed a general assignment pursuant to the statute of Massachusetts of 1836. The defendant became a party to the assignment on the day of its date, and received dividends, on the 1st of July, twenty per cent.; in October, 1837, fifteen per cent., and on September 3d, 1838, ten per cent.; but he has never made any claim on account of the said guaranty. On the 25th of April, 1837, Russell & Co., in the absence of Tuckerman, drew on the faith of said letter of credit and for account of said Bruce, a bill on the plaintiffs for two thousand pounds sterling, payable to the order of the plaintiffs at six months' sight. The said bill was in part payment of a shipment of teas made by said Russell & Co. to Boston, for account of said Bruce, and consigned to the plaintiffs. Russell & Co. remitted the bill directly to the plaintiffs, and being then indebted to them, the said bill was received by the plaintiffs, on or about October 6, 1837, and passed to the credit of Russell & Co., in account current. On the 25th day of June, 1837, the plaintiffs suspended payment, and after that day declined accepting all bills drawn under letters of credit, heretofore granted by said Austin. Their failure and refusal to accept bills were publicly known in Boston about the 15th of July, 1837, and the defendant, who is conversant with such matters, had knowledge thereof on or soon after that day. On the 2d of May, 1836, Austin, as agent aforesaid, gave to Bruce another letter of credit, upon which the defendant entered into a guaranty of the same date. A bill was drawn under this last mentioned letter, and on presentment thereof to the plaintiffs in London, they refused acceptance thereof, and wrote to Bruce a letter under date of June 29th, 1837. This letter was received by Bruce on or about the 9th of August, 1837, and its contents were made known by Bruce to the defendant in the course of a few days after its receipt. The teas purchased with this bill were received in Boston by Mr. Austin, as the attorney of the plaintiffs, about August 28th, 1837. On October 6th, 1837, the plaintiffs notified to Mr. Bruce by letter, that Russell & Co. had drawn on them for £2000, under said letter of credit and that said bill would fall due on the 8th of April, then next, and requested him to provide for its payment with their partner in New York or their agent in Boston. On the 5th of September, 1837, Bruce executed to Russell & Co. an assignment of all his interest in the teas then in the hands of Austin, which assignment was procured in Boston by Mr. Forbes to secure Russell & Co. in case the plaintiff should not accept and pay the said draft of £2000. On the 5th of May, 1838, Mr. Austin made a formal demand on Mr. Bruce for the fulfilment of his engagement, stating that he had received intelligence, that the bill had been received and passed to the credit of Russell & Co. by the plaintiffs. To this letter Mr. Bruce made no answer. On the 13th of October, 1838, Mr. Austin repeated that request by letter to Mr. Bruce, to which Mr. Bruce made no answer; in which last letter Mr. Austin notified to Mr. Bruce, that he should, after the Monday following, sell the teas, holding him and the defendant accountable for the deficiency, if any. The teas were afterwards sold from time to time by Mr. Austin, who remitted the proceeds to the plaintiffs in London; and on making up the account it appeared, that they fell short of the amount due the plaintiffs by the sum of £728. The

last parcel of the teas was sold in January, 1839; and Mr. Austin, on the 4th of March, notified to Mr. Bruce, that he had received the account from the plaintiffs showing that deficiency. In the autumn of 1838, Mr. Austin verbally notified to Mr. Savage, that the teas were on sale, and would probably leave a deficiency of more than £500, for which the plaintiffs would look to him upon his guaranty, to which Mr. Savage replied, in terms neither admitting nor denying his liability. On the 11th of March, 1839, Mr. Austin received from the defendant a letter, dated March 9th, stating that the plaintiff's account had been shown to him by Mr. Bruce at Mr. Austin's request, but denying any right of claim against him, the defendant. To which Mr. Austin replied on the 11th of March, making a formal demand on the defendant for the deficiency. To this demand Mr. Savage replied on the 12th of March, reiterating his denial of the claim. Russell & Co. received full payment of the bill from the plaintiffs in account current. Mr. Bruce was insolvent at the maturity of the bill, and continued to be so until the present time, as to all debts contracted before his assignment; and this suit is brought to recover the £500 and interest upon the guaranty of the defendant. If the law of England, in respect to a promise to accept a non-existing bill, shall come in question, either party may read the deposition of Sir Frederick Pollock and Mr. Hill as evidence of the foreign law, if the court shall consider the depositions of English lawyers competent evidence in this court of the common law of England. The whole case is submitted to the court upon the law and facts, with authority to draw such inferences as a jury would be justifiable in drawing from the facts as stated.

F. Dexter, for plaintiffs.
Charles P. Curtis and B. R. Curtis, for defendant.

STORY, Circuit Justice. Several points have been suggested at the argument, upon some of which I do not entertain any doubt; and, therefore, they may be disposed of in a few words. It is said, that by the law of England, where the bill of exchange, drawn in this case, was to be accepted, and to be payable, a promise to accept a non-existing bill, even though the bill is taken by the holder upon the faith of that promise, does not amount to an acceptance of the bill, when drawn, in favor of the holder. The opinions of Sir Frederick Pollock and Mr. Hill, who are admitted, on all sides, to be very eminent counsel, taken under commission, are direct and full to the point, and leave no doubt as to the present state of the law in England, although certainly it was formerly a matter of no inconsiderable controversy. The language of Lord Mansfield, in Pillans v. Van Mierop, 3 Burrows, 1663, and Pierson v. Dunlop,

Cowp. 571, and Mason v. Hunt, Doug. 296, certainly went very far to establish the contrary doctrine in its full latitude, although it was somewhat shaken but not directly overturned in the subsequent case of Johnson v. Collings, 1 East, 98. It was in this state of the authorities, that the question was first presented to the supreme court of the United States, in the case of Coolidge v. Payson. 2 Wheat. [15 U. S.] 66; and upon the footing of the cases before Lord Mansfield, it was then held, that a letter written within a reasonable time before or after the date of a bill of exchange, describing it in terms not to be mistaken, and promising to accept it, is, if shown to the person, who afterwards takes the bill upon the credit of the letter, a virtual acceptance, binding the person, who makes the promise. To this doctrine, thus limited, the supreme court have ever since steadily adhered, whenever the question has (as it has on several occasions) since come before it. But on the other hand, the court has shown a strong disinclination in any respect to enlarge the doctrine of a virtual acceptance of non-existing bills. Schimmelpinnich v. Bayard, 1 Pet. [26 U. S.] 264; Boyce v. Edwards, 4 Pet. [29 U. S.] 121. It is, perhaps, to be lamented, that the doctrine of such virtual acceptances ever was established; and if the question had been entirely new, I am well satisfied, that it would not have been recognised, as fit to be promulgated, by that court, it being at once unsound in policy, and full of inconvenience. But the supreme court yielded, as did the judge, who decided that case in the circuit court, to what seemed, at that time, the true result of the English authorities upon an important practical commercial question. I am not sorry to find, that professional opinion has now settled down in England against the doctrine; although there is no pretence to say, that, up to this very hour, there has been any formal decision in Westminster Hall against it. But it does not appear to me, that the doctrine ever was applicable, or could be applied, to any bills of exchange, except such as were payable on demand, or at a fixed time after date. Where bills are drawn payable at so many days after sight, it is impracticable to apply the doctrine; for there remains a future act to be done, the presentment and sight of the bill, before the period, for which it is to run, and at which it is to become payable, can commence, whether it be accepted or be dishonored. How can the time be calculated upon such a bill before it is presented? If a letter is written, promising to accept a non-existing bill, to be thereafter drawn at six months sight, when is the acceptance to be deemed made? At the date of the bill? Certainly not; for that would be at war with the obvious intent of the parties, which plainly is, that the acceptance shall be on a future sight of the bill. If it is said, that the acceptance is to be treated as made, when the bill is actually presented for acceptance, and it is dishonored by the draw-

ee, it is as plain, that we set up a prior intent or promise against the fact. Upon what ground can a court say, when a party promises to do an act in futuro, such, for example, as to accept a bill, when it shall be drawn, and presented to him at a future time, that his promise overcomes his act at that time? That his refusal to perform his promise amounts to a performance of it? It is quite another question, whether the holder, who has taken such a bill upon the faith of such promise may not have some other remedy, either at law or in equity, for the breach of it, against the promisor. My judgment is, that the doctrine of a virtual acceptance of a non-existing bill, by a prior promise to accept it, when drawn, has no application to a bill drawn payable at some fixed period after sight; for it then amounts to no more than a promise to do a future act. I have looked into the authorities; and I do not find in any one of them, that the bill drawn, and to which the doctrine was applied, was a bill drawn payable at or after sight.

Upon another point I have still less doubt; and that is, that the bill of exchange, drawn in this case, was a draft within the scope of the letter of credit, and in conformity to the authority therein given. The argument is, that the bill is not a regular bill of exchange, because it is drawn by Russell & Co. payable to Wildes & Co., who are the drawees of the bill. In point of fact it was so drawn by Russell & Co. for the purpose of being passed to their credit by the drawees, to whom Russell & Co. were then indebted in a larger amount. It appears to me, that this does not change its character as a bill of exchange. An instrument is not less a bill of exchange, because all the parties to it in the character of drawers, payees, and drawees are not different persons. A bill drawn by a person, payable to his own order, has always been deemed to be a bill of exchange in the commercial sense of the phrase. And it would not cease to be such a bill, if it should be indorsed by the drawer payable to the drawee. Now, such a bill so indorsed differs in nothing substantially from the present bill. In truth, where the bill is negotiable, and contains a drawer, a payee, and a drawee, it is, in a commercial sense, a bill of exchange, although one or more of the parties should fill a double character. It is of no consequence, in such a case, what particular individuals represent the dramatic personages. Bills of exchange, so called, have sometimes been drawn by the drawer upon himself, payable to himself or order; and they have been held valid after indorsement by him to another person. But, at all events, the present is a "draft" in the sense of the letter of credit; for the word draft is nomen generalissimum, and includes all orders for the payment of money drawn by one person on another.

The remaining point is that alone, upon which any difficulty can be entertained. It is, whether the plaintiffs (Wildes & Co.) have lost their recourse over against the defendant upon his guaranty, by their omission to give him notice at an earlier period, of the neglect of Bruce to pay the money due according to his engagement upon the bill for £2000. And here, it is important to advert to the dates of some of the material transactions. The letter of credit was given on the 7th of June, 1836. Bruce became insolvent and made a general assignment of his property on the 28th of November, 1836, and the defendant became a party to that assignment on the day of its date. The bill of exchange was drawn by Russell & Co., at Canton, on the 20th of April, 1837, at six months sight. The plaintiffs (Wildes & Co.) suspended payment on the 2d and 5th of June, 1837. The bill was remitted to them by Russell & Co., and was received by the plaintiffs and passed to the credit of Russell & Co. about the 6th of October, 1837, the latter being then indebted to the plaintiffs in a larger amount. On the same 6th of October, 1837, the plaintiffs duly notified to Bruce the receipt of the bill, and that it would fall due on the 8th of April, 1838, and requested him to provide for the payment thereof accordingly. No provision was made by Bruce for the payment of the bill at its maturity. On the 5th of May, 1838, Austin, as agent of the plaintiffs, made a formal demand on Bruce for the fulfilment of his engagement, and stated to him, that the bill had been received, and passed to the account of Russell & Co. by the plaintiffs. Bruce made no reply. Afterwards in December, 1838, Austin gave notice to Bruce of his intention to sell the teas, which were held by him as security for the payment; and the teas were accordingly sold and the sales completed in January, 1839. In the autumn of 1838, probably in October, Austin notified to the defendant, that the teas were on sale, and would probably leave a deficiency beyond the £500. for which the plaintiffs would look to him upon his guaranty. The defendant replied in terms neither admitting nor denying his liability. A formal demand was afterwards made in March, 1839, upon the defendant, for the amount of his guaranty, which he declined paying; and the present suit has been since commenced therefor.

It is upon this posture of the substantial facts (for I omit any reference to others, which have not, in my judgment, any bearing upon the merits of the present case) that the question arises, whether the plaintiffs are entitled to recover, no notice of the default of Bruce having been given to the defendant, until the autumn of 1838. It was said at the argument, that in cases of guaranty of future advances, to be made to another person, notice must be given to the guarantor by the party making the advance, that he accepts the guaranty, and consents to make the advances; and also notice, that he has made the advances and acted upon

the guaranty; and, lastly, notice, that he has made a due demand upon the debtor, and his refusal to pay the amount, when due. The two former, it is added, are conditions precedent to the legal operation of the guaranty; and if not duly given, the guarantor is not bound by his guaranty, whether he suffers any damage or not. The notice of the non-payment, it is admitted, is not a condition precedent; but it must be given in a reasonable time, and if the guarantor suffers any damage from the default of the creditor, he will, at least, to the extent of that damage, be exonerated. I admit, that upon every guaranty for future advances, it is the duty of the party making the advances, to give notice to the guarantor of his acceptance thereof and of his consent to act under the guaranty, and to make the advances. This is conclusively established by the decisions of the supreme court in Russell v. Clark, 7 Cranch [11 U. S.] 69; Edmondston v. Drake, 5 Pet. [30 U. S.] 624; Douglas v. Reynolds, 7 Pet. [32 U. S.] 113; Lee v. Dick, 10 Pet. [35 U. S.] 482; Adams v. Jones, 12 Pet. [37 U. S.] 207; and Reynolds v. Douglas, Id. 497. This doctrine, however, is inapplicable to the circumstances of the present case; for the agreement to accept was contemporaneous with the guaranty, and indeed constituted the consideration and basis thereof. And at all events, here there was due notice of an agreement to give the credit, and to make the advances contemplated by the guaranty.

Upon the other point, I have more difficulty in yielding to the argument. Where a guaranty is accepted, and notice has been duly given to the guarantor, that the party will act upon it, and give credit and make advances accordingly, I am not aware, that it has ever been held, that it was indispensable in all cases to give another and a further distinct notice to the guarantor of the amount of the advances actually made, and the terms, upon which they have been made, when the transaction is completed. All that I have supposed to be generally required of the person, making the advances or giving the credit, after having given due notice of his acceptance and intention to act upon the guaranty, is, to make a demand upon the debtor, when the credit has expired, or the amount has become due, and upon his default to give notice thereof within a reasonable time afterwards to the guarantor. There is no case to my knowledge, which goes the length, that there should be three substantive or distinct notices in all cases, as contended for at the argument; and, as an original question, I should not be disposed to entertain it; since it would throw such arduous duties on the guarantee (as I desire to call the party accepting the guaranty) as would materially tend to impair the utility and convenience of that instrument. I do not mean to say, that there are not, or may not be particular cases of guaranty, in which

such notice may be required. Thus, for example, in such a case as Cremer v. Higginson [Case No. 3,383], where advances were contemplated upon certain future contingencies, which might or might not arise, it might be proper to hold, that some notice should be given to the guarantor within a reasonable time (notwithstanding he had already signified in general terms a willingness to make the advances, if they should be required) that the contingencies had arisen, and the advances had been made, and the guaranty was relied on; for otherwise the guarantor might not definitely know, whether, under such circumstances, the guaranty was acted upon or not. So in the case of Douglas v. Reynolds, 7 Pet. [32 U. S.] 113, 127, where there was a continuing guaranty for advances, acceptances, and indorsements to be made by the party in futuro, it would seem but reasonable, that when the whole transactions are closed, notice of the whole amount, for which the guarantor is held responsible, should be communicated to him within a reasonable time afterwards. The same rule might well apply to a single transaction, such as a single advance, or acceptance, or indorsement, where, from the nature and objects of the guaranty, the guarantor could not otherwise have any means of knowing the extent of his guaranty as to time, amount, or other particulars, essential to guide his future conduct, and to ascertain and fix his responsibility. All such cases must stand upon their own circumstances; and do not seem to furnish just grounds for a general rule. But, without saying, what is or ought to be the general rule, it seems to me, that the doctrine can never properly apply to a case circumstanced as the present, where all the persons are originally privy to the whole transaction; where the case rests upon a letter of credit for a limited amount, to be drawn within a fixed time, and, subject to these restrictions, where the sums for which the drafts are to be drawn, and the times when drawn, are to depend upon the action of the debtor, and the guarantor is a party to the whole of the original contract. In such a case the guarantor has as good means of knowledge and inquiry, as the guarantee, and it is quite as much his duty to make such inquiries, as it is of the guarantee to give him notice of the subsequent facts. If he omits to make any inquiries, he may properly attribute any loss, which he may sustain thereby, to his own laches, or want of vigilance, or to his own confidence in the debtor, and not to any disregard of duty on the other side. In the present case, it is impossible to avoid seeing, that the letter of credit was for a limited time (eighteen months), after which no advances made would bind the guarantor; that the amount was not to exceed £2000; that all the bills were to be drawn in China at six months' sight on London; that the sole object of the letter of credit and advances was to assist the operations of Bruce in a projected en-

terprise or voyage from Boston to the East Indies and back; that it was contemplated, that the bills would not become payable until a very long period after the time, when the guaranty was given; that the return cargo was relied on, as the immediate fund, by which the advances were to be primarily secured; and that the guarantee was to be merely an auxiliary security. It seems to me, that, under such circumstances, no further notice of the actual advances made was necessary to be given to the defendant, until the same became due from Bruce, and there had been some default on his part. The defendant if he wished any information as to the progress or consummation of the voyage, could readily institute the proper inquiries. I am not prepared, therefore, to admit, that under the circumstances of the present case, there was any duty on the part of the plaintiffs to give notice to the defendant of the fact of the bill of £2000 being drawn upon them and received by them and passed to the account of Russell & Co., before the maturity of the bill and the default of Bruce in not paying the same. If it had been the duty of the plaintiffs to give such notice, under such circumstances, I should still say, that it would not discharge the guaranty, unless the defendant could show, that he had suffered some damage from the want of such notice. Indeed, the rights and duties of parties to guaranties must, from the variety of circumstances, under which they have been entered into, be materially governed by the particular circumstances of each case. Lord Tenterden held this doctrine in Van Wart v. Woolley, 3 Barn. & C. 439, 447, to which I shall presently have occasion to refer for another purpose.

It appears to me, then, that the whole question in this case turns upon the point, whether the defendant has received notice of the default of Bruce and the non-payment of the bill, within a reasonable time; and, if he has not, whether he is discharged from his guaranty, unless he has sustained some damage from the want of such notice. I take the doctrine to be clearly settled, that upon a guaranty, to discharge the guarantor, there must not only be a want of notice within a reasonable time, but there must also be some loss or damage sustained by the guarantor; and that if there be a loss or damage, that the guaranty is not totally discharged, but only pro tanto to the amount of the loss or damage. The case is constantly distinguished in the authorities from that of an indorser to negotiable paper. The latter is entitled to strict notice; the guarantor is entitled only to notice, when he is or may be prejudiced by the want of it. If the debtor is solvent when the money becomes due, and no notice is given to the guarantor, and the debtor afterwards and before notice becomes insolvent, the guaranty is discharged. But where the notice would be of no avail, and the guarantor has suffered and can suffer no

damage by the want of notice, he is not discharged by the omission to give it. Ordinarily, therefore, if the debtor is insolvent when the debt became due, and has ever since remained so, no notice to the guarantor is deemed necessary; nay, not even a demand upon the debtor, when the debt became due.

This doctrine seems to me fully sustained by the leading authorities, beginning with the case of Warrington v. Furbor, 8 East, 242. That case was fully recognised in Philips v. Astling, 2 Taunt. 206; and the like doctrine was applied in Holbrow v. Wilkins, 1 Barn. & C. 10, and Van Wart v. Woolley, 3 Barn. & C. 439, 447. In this last case Lord Tenterden said, that in cases of guaranty the nature of the transaction and the circumstances of the particular case were to be considered and regarded; and that, where the debtor had become bankrupt, a demand upon him was unnecessary to charge the guarantor. And in Holbrow v. Wilkins, and Van Wart v. Woolley, the court held, that, as it did not appear, that the guarantor had sustained any damage from the want of a due presentment to the debtor for payment, or of due notice to the guarantor of the default, the guaranty was not discharged. The same doctrine was maintained in Gibbs v. Cannon, 9 Serg. & R. 202, and pointedly asserted in Oxford Bank v. Haynes, 8 Pick. 423. It was also recognised in the fullest extent in Reynolds v. Douglas, 12 Pet. [37 U. S.] 497. And the court in effect there said, that the guarantor is bound, without notice, where the debtor is insolvent at the time, when the debt becomes due; and that his liability continues, unless he can show, that he has sustained some prejudice by the want of notice of a demand on the debtor, and his non-payment; and, if he has sustained any damage, that he will be discharged only to the amount of that damage.

Now, upon these principles, it seems to me difficult to maintain the position, that the present defendant is not liable on his guaranty. Bruce (the debtor) became insolvent before the bill was drawn, and, for aught that appears, he has remained ever since insolvent. The earliest period, in which it would have been practicable to give notice to the defendant of the arrival of the draft and the acceptance by the plaintiffs, must have been after the 6th of October, 1837; and the earliest period at which notice could have been given of the default of payment, must have been after the 8th of April, 1838, when the draft was at maturity. It is not shown, nor as far as I know, even pretended in argument, that notice as soon as practicable after either of these periods, would have been of any advantage to the defendant, or that he has sustained any damage by the omission of such notice. The debtor then was, and as far we know, has ever since been insolvent, and without the means to discharge the debt. If this be so, then, upon the general principles already stated, the defendant is not discharged

from his guaranty. But, it appears to me, that there are circumstances in the present case, which show, that the notice was within a reasonable time; and indeed, as early, if not earlier, than the case required. It is plain to me (as I have already intimated) that the understanding was, that the teas should be the primary fund or security for the payment of the debt; and until that fund was exhausted by a sale, and the actual deficiency was ascertained, I do not well see how the defendant could be called upon to pay the sum due upon his guaranty. It would be an unliquidated deficiency. In a court of equity, at all events, the defendant would have been entitled to require, that the teas should first be sold and applied to the payment of the debt pro tanto, before he was called upon to pay the amount secured by his guaranty. Now, in point of fact, in or about October, 1838, and before the sale of the teas, he had due notice of the advances and of the probable deficiency. He made no objection to the sale; he did not positively insist upon his being then discharged from the guaranty. The sales were not concluded until the succeeding January, and he had due notice thereof in a short period after the entire deficiency was ascertained. Now, if I am right in this view of the facts, that the guaranty was not to be insisted on, until the other fund was exhausted, and the proceeds of the sales were first to be applied in discharge of the defendant, the demand was made upon the defendant within a reasonable time. It was made as soon as it properly could be. And it is not shown, that an earlier sale, if practicable, would have been desirable, or of any higher benefit to the parties.

Upon the whole, upon the best consideration, which I am able to give this case, the plaintiff is entitled to judgment for the amount of the guaranty, as well upon the special principles of law, as the general circumstances of the case.